UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GOAT FASHION LTD.,

                                        Plaintiff,                    19 Civ. 11045 (PAE)

                        -v-
                                                                     <u>OPINION & ORDER</u>
1661, INC.,

                                        Defendant.

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff Goat Fashion Ltd. ("Goat Fashion") brings this action against defendant 1661,

Inc. ("1661").  Goat Fashion brings claims of trademark infringement and unfair competition

under both federal law and common law; claims a breach of contract and a violation of New

York General Business Law § 349; and requests the amendment or cancellation of 1661's Class

42 Trademark Registration.  Goat Fashion alleges that 1661 improperly used its trademark (the

"GOAT" mark) on its website and mobile application in connection with apparel.  Goat Fashion

now moves for a preliminary injunction enjoining 1661 from selling apparel and apparel

accessories using the GOAT mark.  For the reasons that follow, the Court grants Goat Fashion's

motion.

## I.      Background

### A.      Factual Background[1]

#### 1.      The Parties and the GOAT Mark

Plaintiff Goat Fashion is a corporation incorporated in the United Kingdom with its

principal place of business in London.  Dkt. 1 ("Compl.") ¶ 8.  Goat Fashion is a fashion

---

[1] This account is drawn from the Complaint and the opening declarations of Jane Lewis, Dkt. 27
("Lewis Decl."), and Daishin Sugano, Dkt. 41 ("Sugano Decl.").

designer and clothing retailer that sells clothes all over the world through retail outlets, its website, and the websites of others, all under the GOAT mark. *Id.* ¶¶ 12–13. Goat Fashion has three trademark registrations: a 2008 registration in international class 25 for "clothing," U.S. Reg. No. 3506834; a 2012 registration in international class 35 for "retail store services and online retail store services featuring clothing and clothing accessories," U.S. Reg. No. 4103419; and a 2016 registration in international class 25 for "children's clothing and knitwear," U.S. Reg. No. 5066855. *Id.* ¶¶ 14–15.

Goat Fashion first started continuously using the GOAT mark in the United States in 2003, and since then, Goat Fashion's GOAT mark has allegedly become distinctive both within the industry and the public realm. *Id.* ¶¶ 16–18. Goat Fashion has spent a substantial amount of time, money, and resources advertising its apparel under the GOAT mark by launching a global e-commerce website in 2012 and a U.S. website in 2016; retaining a public relations firm; investing in sales and public relations trips to the United States; and attending trade shows. *Id.* ¶ 19. Between September 2015 and November 2019, Goat Fashion spent approximately $300,000 on its advertising efforts in the United States. *Id.* Such efforts appear to have borne fruit as Goat Fashion has received unsolicited media coverage and has been featured in major fashion magazines including Vogue. *See id.* ¶ 20.

Defendant 1661 is a corporation incorporated under the laws of Delaware with its principal places of business in California. *Id.* ¶ 9. 1661 provides an online retail marketplace for sneakers, including brands such as Nike, Adidas, Gucci, and Yeezy. *Id.* ¶ 23; Sugano Decl. ¶ 3. 1661 maintains both an e-commerce website and a mobile platform that it uses in connection with its GOAT mark. Compl. ¶ 23; Sugano Decl. ¶ 6. 1661 has four trademark registrations of its own GOAT mark: a 2016 registration in international class 9 for "computer application

software to buy and sell goods," U.S. Reg. No. 4908313; a 2017 registration in international

class 35 for "online marketplace for athletic and sporting footwear," U.S. Reg. No. 5357448;

a 2016 registration in international class 38 for "telecommunication services for App," U.S. Reg.

No. 5020477; and a 2016 registration in international class 42 for "online marketplace; and

authentication services for collectible goods, including 'athletic and sporting footwear, apparel,

and works of art,'" U.S. Reg. No. 5020478.  Compl. ¶ 24; Sugano ¶ 11.  Initially, the United

States Patent and Trademark Office ("USPTO") refused to register 1661's GOAT mark for its

class 35 registration because of the likelihood of confusion with Goat Fashion's class 35

registration.  *See* Compl. ¶ 25.

> ## 2.     The 2017 Consent Agreement

To obtain its class 35 registration, 1661 requested that Goat Fashion and 1661 enter into a

consent agreement.  *Id.* ¶ 26.  On or around April 18, 2017, Goat Fashion and 1661 entered into a

Mutual Consent and Coexistence Agreement.  *Id.* ¶ 27; *see also* Lewis Decl., Ex. 38 ("Consent

Agreement").  The Consent Agreement permitted 1661 to use the GOAT mark providing goods

and services, including in an online marketplace or retail service, "provided however that such

goods and services may *not* be provided in connection with the sale and purchase of fashion

clothing or fashion accessories." Consent Agreement § 4.3 (emphasis in original); *see also*

Compl. ¶ 28.  Goat Fashion agreed not to use its own mark for "athletic and sporting footwear."

Consent Agreement § 4.3; *see also* Compl. ¶ 28.  The Consent Agreement also permits 1661 to

use the mark for certain authentication, inspection, and verification services.  *See* Consent

Agreement § 2.

The Consent Agreement mandated that if 1661 wanted to apply for an additional

registration for its GOAT mark or materially amend its already existing registrations, 1661

should contact Goat Fashion to determine if another consent agreement was required.  Consent Agreement § 5.2; Compl. ¶ 29.  Before the execution of the Consent Agreement, 1661 purportedly asked Goat Fashion if it could use its GOAT mark on athletic apparel in certain circumstances.  Compl. ¶ 30.  Goat Fashion refused, and the Consent Agreement was executed without the new provision.  *Id.*  In July 2019, 1661 once again sought Goat Fashion's permission to apply for a GOAT registration in class 25 for "casual, athletic and sporting footwear, clothing/apparel, and related accessories."  *Id.* ¶ 31.  Goat Fashion again refused but offered to enter into a license agreement with 1661.  *Id.* ¶ 33; Lewis Decl. ¶ 100.  Goat Fashion and 1661 did not enter into any such license agreement.  *See* Compl. ¶ 34; Lewis Decl. ¶ 101.

### 3.    Goat Fashion's Claims against 1661

On October 21, 2019, 1661 began selling clothing through its smartphone mobile application.  *See* Sugano Decl. ¶ 14.  On February 14, 2020, 1661 began selling clothing on its e-commerce website.  *Id.*  As to each, 1661 sold clothing while using its GOAT mark.  *See id.*

In response to 1661's initiation of clothing sales using the GOAT mark, Goat Fashions brings various claims of trademark infringement, common law unfair competition, and breach of contract.

The Complaint first alleges trademark infringement in violation of § 32(1) of the Lanham Act and federal unfair competition in violation of § 43(a) of the Lanham Act.  Compl. ¶¶ 45, 54. Goat Fashion contends that 1661's use of its GOAT mark is likely to deceive consumers into thinking that 1661's goods are affiliated with Goat Fashion, and that 1661 has used its Goat mark improperly and willfully, causing irreparable harm to Goat Fashion and its reputation.  *Id.* ¶¶ 44–55.

The Complaint also alleges common law trademark infringement and unfair competition, resulting in 1661's unjust enrichment. *Id.* ¶¶ 61–63. The Complaint also brings a claim under N.Y. Gen. Bus. Law § 349, alleging that 1661's actions are "(i) consumer oriented; (ii) constitute deceptive acts or practices in the conduct of a business, trade, and commerce in New York in a material way; and (iii) cause Goat Fashion injury as a result of such deceptive and misleading activities . . . ." *Id.* ¶ 65.

The Complaint further alleges a breach of contract for 1661's violation of the terms of the Consent Agreement. *See id.* ¶ 71. In this claim, Goat Fashion alleges that it performed under the agreement by not using its GOAT mark in relation to "athletic and sporting footwear," but that 1661's use of its GOAT mark in connection with clothing breached the contract. *Id.* ¶¶ 70–71.

Finally, the Complaint seeks the cancellation or amendment of 1661's registration in class 42 because of the likelihood of confusion that will result now that 1661 sells apparel. *See id.* ¶ 59. If 1661's registration under this class is not cancelled, the Complaint requests the registration be amended to exclude "apparel." *Id.* ¶ 60.

### B. Procedural History

As previously stated, in July 2019, 1661 sought Goat Fashion's consent under § 5.2 of the Consent Agreement to begin selling apparel on its platforms under the GOAT mark. Lewis Decl. ¶ 97. Goat Fashion refused and offered to license the mark to 1661 for use in selling apparel. *Id.* ¶¶ 99–100.

Nevertheless, on October 21, 2019, 1661 began selling clothing through its smartphone mobile application. *See id.* ¶ 101–102. Approximately six weeks later, on or around December 2, 2019, Goat Fashion sent 1661 a cease and desist letter regarding the sale of apparel on 1661's mobile application, and filed the Complaint in this action. *See id.* ¶ 103. On

January 23, 2020, 1661 answered the Complaint and offered a settlement proposal, which was rejected on February 6, 2020.  *See id.* ¶ 107; Dkt. 14.  On February 14, 2020, 1661 began selling clothing and accessories on its e-commerce website.  Sugano Decl. ¶ 14.  On February 27, 2020, Goat Fashion discovered that 1661 had begun selling clothing and accessories on its website. Lewis Decl. ¶ 110.

On March 17, 2020, Goat Fashion contacted the Court about the procedure for seeking a temporary restraining order (TRO) in connection with Goat Fashion's motion for a preliminary injunction.  Dkt. 24 ("Joint Ltr.") at 1.  On March 18, 2020, during a conference call with all parties, Goat Fashion agreed to forgo the TRO in light of the public health crisis, and instead to move for a preliminary injunction, and 1661 agreed that Goat Fashion's forbearance from seeking emergency relief given the pandemic would not be held against Goat Fashion.  *See id.* at 2.  The Court directed the parties to undertake, after the filing of Goat Fashion's motion for a preliminary injunction, if necessary, prompt discovery on issues relevant to the motion.  *Id.* at 1.

On March 23, 2020, Goat Fashion filed its motion for a preliminary injunction and accompanying memorandum of law.  *See* Dkt. 29 ("Pl. Mem.").  On May 8, 2020, 1661 filed its opposition to Goat Fashion's motion.  *See* Dkt. 36 ("Def. Opp.").  On May 26, 2020, Goat Fashion filed its reply.  Dkt. 49 ("Pl. Reply").

## II.     Motion for a Preliminary Injunction

### A.     Applicable Law

The decision to grant or deny a preliminary injunction rests in the district court's sound discretion.  *See Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 232 (2d Cir. 1998).  A preliminary injunction is an extraordinary remedy that should not be granted as a routine matter. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990); *Patton v. Dole*,

806 F.2d 24, 28 (2d Cir. 1986).  The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted) (quoting 11A Charles Alan Wright, Arthur R. Miller, and Mary K. Kane, Federal Practice and Procedure § 2948(2d ed. 1995)).

To obtain a preliminary injunction in the Second Circuit, a plaintiff must demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation . . . ."  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  Goat Fashion must also show that the balance of hardships "tips in plaintiffs' favor," and that the "public interest would not be disserved by the issuance of a preliminary injunction."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)).

## B.    Discussion

### 1.    Irreparable Harm

Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction[.]"  *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2948 (1973)).  In trademark cases, a plaintiff must make an independent showing of irreparable injury.[2]  *New Look Party*, 2012 WL 251976, at *10; *see also Fashion Week, Inc. v.*

---

[2] Previously, in trademark cases, courts presumed irreparable harm upon a showing of likelihood of success on the merits.  *See New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 Civ. 6433 (NRB), 2012 WL 251976, at *10 (S.D.N.Y. Jan. 11, 2012).  After the decision in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), however, such a presumption is no longer permitted.  *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 332 (S.D.N.Y. 2011); *see New Look Party Ltd.*, 2012 WL 251976, at *10.

*Council of Fashion Designers of Am., Inc.*, No. 16 Civ. 5079 (JGK), 2016 WL 4367990, at *3 (S.D.N.Y. Aug. 12, 2016).  To do so, a plaintiff need only show a "*threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original).

Under this prong, Goat Fashion must show that "the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir. 1995); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989).  "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger*, 607 F.3d at 81.  In copyright- and trademark-infringement cases, courts frequently find irreparable harm upon a showing of "possible market confusion" because "to prove the loss of sales due to infringement is notoriously difficult." *Id.* (quoting *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971)).  Although the typical remedy for breach of contract is damages, courts have the discretion to grant a preliminary injunction in a breach of contract action where damages are "clearly difficult to assess and measure." *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994) (quoting *Rosenfeld v. W.B. Saunders*, 728 F. Supp. 236, 244 (S.D.N.Y.1990)).

Here, Goat Fashion contends that actual consumer confusion will lead to irreparable reputational harm.  Goat Fashion provides examples of confusion relating to both 1661's sneakers and apparel.  With respect to sneakers, Goat Fashion represents that "yeezy" is the most popular search term on its website, and as of March 10, 2020, there had been 2,758 searches for "yeezy." Lewis Decl. ¶ 115.  "Yeezy," however, is a sneaker produced by Adidas, designed by

Kanye West, and sold by 1661. *See id.* As of March 10, 2020, there were also searches for "Nike Jordan 1," "Jordan 1," and "Nike," each of which refer to products sold by 1661, not Goat Fashion. *See id.* ¶ 116. Goat Fashion represents that it has noticed this pattern whenever 1661 releases a new sneaker. *See id.*

Although this confusion is related to 1661's permitted use of the GOAT mark for sneakers, these many search inquiries misdirected to its website reflects real confusion. It strongly suggests that consumers are inclined to confuse Goat Fashion's and 1661's platforms, presumably on account of the common "GOAT" motif. The volume of inquiries about sneaker sales is, presumably, particularly large insofar as 1661 has been selling sneakers for a longer period of time.

Goat Fashion has also adduced evidence of confusion relating to apparel. Goat Fashion's website has recently received searches for "Supreme shirt," "Gucci belt," and "hoodie"—each of which is an item of apparel or an apparel-related accessory sold by 1661. Pl. Reply at 7–8. Before the COVID-19 shutdown, Goat Fashion received about two to three communications each week from customers looking to speak to a representative of 1661. *See id.* at 7.

The Court finds that consumer confusion between its apparel and that marketed by 1661 is likely to injure Goat Fashion's reputation, goodwill, and sales, in a such a way that may be difficult or impossible later to quantify or rectify. Having invested substantial time and resources into developing its reputation and products, Goat Fashion has demonstrated that continued consumer confusion will likely lead to the loss of its ability to control its mark. *See* Pl. Mem. at 21. Injuries to Goat Fashion's sales and reputation are all the more likely because 1661 has received various poor customer service reviews. *See* Pl. Reply at 2–3. The harms stemming from Goat Fashion's loss of control over its mark are, further, inherently difficult to quantify,

and as such, constitute irreparable harm.  *See Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985) ("The first element, irreparable injury, exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial.").  This evidence adequately supports Goat Fashion's claim that it is at risk of reputational harm were 1661 permitted, in contravention of the Consent Agreement, to sell apparel using the GOAT mark.  Such harm, by nature, is hard to quantify, and reputational injuries, once loosed, are hard to contain.  Further, although courts are generally disinclined to grant a preliminary injunction in breach of contract actions, courts may grant an injunction when the movant demonstrates that damages are "clearly difficult to assess and measure."  *Gen. Textile Printing*, 862 F. Supp. at 1075.  Goat Fashion has made such a showing here, where the contract is inextricably linked to the Goat Fashion's protection of its reputation and of its mark.

In determining whether there is irreparable harm, courts must also consider delay by the movant.  *See Fashion Week, Inc.*, 2016 WL 4367990, at *3.  Unless adequately explained, "delay alone may justify denial of a preliminary injunction" for trademark infringement.  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)); *see also Citibank*, 756 F.2d at 276 (explaining that delay may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction").  Acceptable explanations for delay include the plaintiff's ignorance regarding defendant's alleged infringement, good-faith attempts to investigate that infringement, and diligent pursuit of settlement negotiations.  *See Tough Traveler*, 60 F.3d at 968; *Marks Org.*, 784 F. Supp. 2d at 333.

Here, there was some delay.  1661 first started selling apparel on its mobile platform on October 21, 2019.  *See* Pl. Reply at 3.  On February 27, 2020, Goat Fashion informed the Court

of its need to file a TRO or preliminary injunction. *Id.* As a result of the then-descending COVID-19 pandemic, Goat Fashion waited to file its motion until March 23, 2020. *See id.* And, during the scheduling conference on March 18, 2020, all parties agreed that the delay attributable to COVID-19 should not be held against Goat Fashion. *See id.*; Joint Ltr. at 2. Under these circumstances, the Court treats the relevant period of delay as the four months between October 21, 2019 and February 27, 2020.

Goat Fashion provides several justifications for the four-month delay. Goat Fashion explains that 1661 did not begin selling apparel on its "more ubiquitous" website until February 2020, which made acting to block its apparel sales more pressing for Goat Fashion. Lewis Decl. ¶ 6. That was because any consumer with an internet connection could access the website, whereas the mobile application first required a consumer to download the app. *See id.* ¶ 106. Goat Fashion also argues that the delay was a result of good-faith investigation and hopes of settling. Pl. Reply at 3. It represents that the parties were engaged in discussions as early as October 2019 and had continued those negotiations, in good faith, after the complaint was filed in December 2019. *See* Lewis Decl. ¶¶ 6–7, 101–107. 1661, while not disputing these facts, argues that, given Goat Fashion's four-month delay, there is no emergency justifying entry of a preliminary injunction. *See* Def. Opp. at 9–10. 1661 also argues that there is no meaningful distinction between its sales of apparel on its mobile application and its website sales that would justify Goat Fashion's waiting until the latter had occurred to seek court intervention. *See id.*

The Court finds that Goat Fashion has provided a reasonable explanation for its decision to seek an injunction only after the launch of apparel sales on 1661's e-commerce website. In particular, good-faith attempts at settlement and investigations are acceptable justifications for delay. *See Tough Traveler*, 60 F.3d at 968; *Marks Org.*, 784 F. Supp. 2d at 333–34 (finding 16-

month delay did not vitiate finding of irreparable harm).  And it is undisputed that the parties were engaged in good-faith attempts to resolve this matter during virtually the entirety of the four-month period at issue.  As such, Goat Fashion has met its burden in demonstrating irreparable harm with respect to its trademark-infringement claim.

### 2. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty.  [It] need only make a showing that the probability of [their] prevailing is better than fifty percent."  *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (citation omitted).  The "'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  *Citigroup Glob. Mkts.*, 598 F.3d at 35.

### a. Breach of contract claim

To recover on a breach of contract claim under New York law,[3] a party must demonstrate "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages."  *Eternity Glob. Master Fund. Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted); *see also Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 921 N.Y.S.2d 260, 264 (2d Dep't 2011)

---

[3] Although the Consent Agreement does not contain a choice of law provision, *see* Consent Agreement, both parties apply New York law in their submissions.  Where "[t]he parties' briefs assume that New York law controls . . . such implied consent . . . is sufficient to establish choice of law.'"  *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (quoting *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)); *see Holliday as Tr. of LB Litig. Tr. v. Brown Rudnick LLP*, No. 19 Civ. 10925 (PAE), 2020 WL 4340786, at *8 (S.D.N.Y. July 28, 2020).  Accordingly, the Court analyzes the Consent Agreement under New York law.

(same).  1661 concedes that the Consent Agreement is a valid contract and that Goat Fashion has

adequately performed.  Def. Opp. at 13.  However, 1661 contends that Goat Fashion has not

shown that 1661 has breached the Consent Agreement.  *Id.*

   "The primary objective of a court in interpreting a contract is to give effect to the intent

of the parties as revealed by the language of their agreement."  *Compagnie Financiere CIC

L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157

(2d Cir. 2000).  Words and phrases in a contract "should be given their plain meaning, and the

contract should be construed so as to give full meaning and effect to all of its provisions."  *Olin

Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (quoting *LaSalle Bank Nat'l

Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).  "A written agreement

that is clear, complete and subject to only one reasonable interpretation must be enforced

according to the plain meaning of the language chosen by the contracting parties."  *In re Coudert

Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) (quoting *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l

Ins. Co.*, No. 09 Civ. 1796 (GBD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012)).

   "Where the parties dispute the meaning of particular contract clauses, the task of the

court 'is to determine whether such clauses are ambiguous when read in the context of the entire

agreement.'"  *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467

(2d Cir. 2010) (quoting *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095

(2d Cir. 1993)).  Ambiguity is "defined in terms of whether a reasonably intelligent person

viewing the contract objectively could interpret the language in more than one way."  *Topps Co.

v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  "An ambiguity exists where the terms

of the contract 'could suggest more than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire integrated agreement and who is

cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Law Debenture Tr.*, 595 F.3d at 466 (quoting *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  Parties cannot "create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers*, 7 F.3d at 1095.

Two sections of the Consent Agreement address 1661's rights to register and use the GOAT mark.  *See* Consent Agreement §§ 2, 4.  Under § 2, Goat Fashion consents to 1661's registration and use of the GOAT mark in connection with 1661's role as an e-commerce platform:

> Providing an online marketplace for buyers and sellers of collectible consumer goods, namely, athletic and sporting footwear; online trading services in which sellers post collectible consumer goods, namely, athletics and sporting footwear to be offered for sale, and purchasing is done via the Internet in order to facilitate the sale of goods by others via online computer and mobile networks[.]

*Id.* § 2 (emphasis omitted).  Section 2 also identifies 1661's permitted business services:

> [B]usiness services, namely the inspection, verification, and authentication of collectible consumer goods in order to facilitate the sale of goods by others via online computer and mobile networks; identification, screening, and validation services of sellers for the purpose of assisting buyers purchase legitimate collectible consumer goods via online computer and mobile networks[.]

*Id.* (emphasis omitted).

1661 argues that § 2 permits it to offer authentication services[4] and identification, screening, and validation services "in connection with the sale of sneakers, ***apparel***, and

---

[4] It is unclear whether 1661 was offering any authentication services of apparel at the time that Goat Fashion filed its motion.  *Compare* Dkt. 48 ("Telesca Reply Decl.") ¶¶ 50–55 (citing deposition testimony from Sugano indicating that 1661 does not yet authenticate apparel because 1661 only offers new apparel on its site, which does not require authentication), *with* Def. Opp. at 13 ("Defendant . . . continues to offer [authentication] services with the sale of sneakers, apparel, and accessories by its seller partners.").

accessories by its other seller partners," as it has done since 2015.  Def. Opp. at 13 (emphasis added).  Its argument is, implicitly, that the § 2 term "collectible consumer goods," which in the context of the offering of an online marketplace or trading services is limited to "athletic and sporting footwear," carries a broader meaning in connection with § 2's authentication and identification provision, so as to include apparel.  *See* Consent Agreement § 2.  There is, however, no textual charter for the reading.  Reading § 2 as a whole, the more persuasive reading is that "collectible consumer goods" is intended to have the same definition throughout the section, namely, that such goods are limited to athletic and sporting footwear.

In any event, even assuming *arguendo* that "collectible consumer goods" carries a broader meaning with respect to authentication and identification services, those are not at issue on this motion.  Goat Fashion has not moved to enjoin 1661 from using the GOAT mark in offering such services in connection with apparel items.  Rather, Goat Fashion seeks to enjoin 1661 from "***selling*** clothing and clothing accessories" on its e-commerce platform.  Pl. Mem. at 1 (emphasis added).  And as to that point, the first of the two clauses of § 2 quoted above is conclusive.  To the extent that § 2 permits 1661 to use the GOAT mark in connection with an "online marketplace" or "online trading services," § 2 states that 1661 may do so only in offering "collectible consumer goods, ***namely, athletic and sporting footwear***[.]"  Consent Agreement § 2 (emphasis added).  There is nothing in that provision that contemplates 1661's sale of apparel.

1661's theory in support of its construction appears to be that its offer of apparel and accessories for sale qualifies as a "business service[]," even if it falls outside its permitted role in providing an "online marketplace" or "online trading services.  1661 argues that it does not offer "online retail store services featuring clothing" because it merely "facilitates the sale by others of

third party branded products by authenticating those products before they are sent to buyers."
Def. Opp. at 14.  That interpretation is highly improbable.  It strains the plain language of
"online marketplace" or "online trading service."  Accordingly, Goat Fashion is likely to succeed
in demonstrating that 1661's current uses of the mark in its apparel services are not authorized by
§ 2's plain language.

A separate provision of the Consent Agreement relevant to this motion is § 4.  Section 4
places additional restrictions on each party's use of the GOAT mark.  Goat Fashion there agreed
not to use the GOAT mark for the services described in 1661's then-trademark application.  *See*
Consent Agreement § 4.2.  And 1661, for its part, agreed not to use the GOAT mark for services
described in Goat Fashion's Class 35 trademark registration.  *See id.* § 4.1.  One such service in
Goat Fashion's trademark registration is "online retail store services featuring clothing and
clothing accessories."  Lewis Decl., Ex. 13; *see* Pl. Mem. at 5.  Section 4.3 further clarifies
1661's permitted uses:

> The Parties agree that [1661] may use "GOAT" to provide goods and services,
> including online marketplace and/or retail services, in connection with the sale and
> purchase of athletic and sporting footwear and related accessories, . . . provided
> however that such goods and services may *not* be provided in connection with the
> sale and purchase of fashion clothing or fashion clothing accessories.

Consent Agreement § 4.3 (emphasis in original).

Goat Fashion argues that 1661 has breached both §§ 4.1 and 4.3 by using the GOAT
mark in offering clothing and accessories on its online marketplace.  Pl. Mem. at 5.  1661
defends on the ground that it does not offer "online retail store services featuring clothing"
because it merely "facilitates the sale by others of third party branded products by authenticating
those products before they are sent to buyers" and thus has not breached § 4.1.  Def. Opp. at 14.
That argument is factually dubious.  As Goat Fashion has demonstrated, 1661 does not limit its

16

use of the GOAT mark to the authentication of apparel goods or the facilitation of third-party sales.  Pl. Reply at 5.  Rather, 1661 uses the GOAT mark on its e-commerce platform (either through the website or app); the customer's credit card is charged in a manner in which the GOAT mark appears; 1661's packaging bears the GOAT mark; and refunds are handled by GOAT customer services.  *See id.*  These activities are typically conducted by and associated with an online retailer or marketplace.  And if none of them constituted an offering of online retail services, it is unclear what purpose § 4.3 would serve.  1661 relatedly describes itself as "operat[ing] as a 'middleman' between buyers and sellers" and states that it "does not itself manufacture or sell the products" on its platform.  Def. Opp. at 2, 14.  But if 1661's facilitation of the sale of apparel, which tracks its activities as to sneakers, does not constitute "online retail services," then neither does 1661's sale of sneakers, rendering § 4.3 superfluous.  *See Int'l Multifoods Corp.*, 309 F.3d at 86 ("We disfavor contract interpretations that render provisions of a contract superfluous.").

The Court therefore rejects 1661's argument that its conduct selling apparel using the GOAT mark is compatible with §§ 4.1 and 4.3.  It is not.  Regardless, though, even if 1661's conduct did not separately run afoul of these sections, there is no coherent reading of them in which they supervene § 2, which, as noted earlier, appears squarely to prohibit 1661 from engaging in the apparel sales at issue.

The Court accordingly finds that Goat Fashion has established a likelihood of success on its breach of contract claim.

> ### b.    *Lanham Act claims of trademark infringement and unfair competition*

Goat Fashion also brings claims under § 32(1) of the Lanham Act, 15 U.S.C. § 1114, and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Although § 32(1) concerns registered marks,

whereas § 43(a) concerns unregistered, common law marks, *see Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003), the same analysis applies to both provisions, *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114–15 (2d Cir. 2006). That is, "[t]o prevail on a trademark infringement claim under §§ 32 and 43(a) of the Lanham Act, a plaintiff must demonstrate (1) that it has a valid mark entitled to protection and (2) that the defendant's use of it is likely to cause confusion." *Chloe v. Queen Bee of Beverly Hills, LLC*, No. 06 Civ. 3140 (RJH), 2011 WL 3678802, at *3, (S.D.N.Y. Aug. 19, 2011) (alterations omitted) (quoting *Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999)).

"[A] certificate of registration with the Patent and Trademark Office is prima facie evidence that the mark is registered and valid (*i.e.*, protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012) (quoting *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999)). There is no dispute that Goat Fashion's mark was lawfully registered with the USPTO. The first element is, therefore, satisfied.

In considering the likelihood of confusion, courts in this Circuit generally look to the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).[5] The factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the products sold under the

---

[5] The Court declines Goat Fashion's invitation to forgo applying the *Polaroid* factors. Pl. Mem. at 7–8. Goat Fashion contends that it can alternatively prevail on the Lanham Act claims if the Court is persuaded that 1661's use of the GOAT mark constitutes a "counterfeit," *see C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 241 (S.D.N.Y. 2013). The Court's assessment, however, is that, at this stage, a considered evaluation of the *Polaroid* factors yields a surer assessment of Goat Fashion's likelihood of success on the merits.

marks; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the

defendant's good faith, or lack thereof, in adopting its mark; (7) the quality of the defendant's

product; and (8) the sophistication of the plaintiff's customers.  *Time, Inc.*, 173 F.3d at 117; *see*

*also Polaroid*, 287 F.2d at 495.

In applying the *Polaroid* test, "[t]he proper approach is to weigh each factor in the

context of the others to determine if, on balance, a likelihood of confusion exists."  *W.W.W.*

*Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993).  The court "generally should not

treat any single factor as dispositive; nor should [it] treat the inquiry as a mechanical process by

which the party with the greatest number of factors wins."  *Playtex Prods., Inc. v. Georgia-Pac.*

*Corp.*, 390 F.3d 158, 162 (2d Cir. 2004).  "Instead, the court should focus on the ultimate

question of whether consumers are likely to be confused."  *Id.* (citation omitted).

### i.    Strength of Goat Fashion's mark

A mark's "strength" is "crucial to the likelihood of confusion analysis" because a

plaintiff's well-known association with the claimed mark "makes it much more likely that

consumers will assume wrongly that [the plaintiff] is somehow associated with [the defendant's

product] or has authorized the use of its mark."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss &*

*Co.*, 799 F.2d 867, 873 (2d Cir. 1986); *see also H. Lubovsky, Inc. v. Esprit De Corp.*,

627 F. Supp. 483, 486–87 (S.D.N.Y. 1986) ("The strength of a mark is directly related to

likelihood of confusion, for the stronger the mark, the more likely that the consumer will

associate it with the familiar purveyor.").  By contrast, where the plaintiff's mark is not

associated with any particular source, defendant's use of a similar mark is unlikely to generate

confusion.  *See Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 215–16 (2d Cir. 1985) ("If a

mark has secondary meaning, a purchaser will associate it with a certain producer, and will be

likely to make that same association when an identical mark (or a confusingly similar mark), is used on another producer's product. In the absence of secondary meaning, however, there will be no such association in the minds of the purchasing public.").

A mark's strength is measured by two factors: "(1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 287 (S.D.N.Y. 2018) (citation omitted). These factors are often labeled "conceptual strength" and "commercial strength." *Id.*

With respect to conceptual strength, the Second Circuit has identified four categories of marks to guide courts in assessing a mark's strength, with each successive category generally receiving higher levels of trademark protection than the preceding one: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (1976). Generic marks are usually common descriptions of goods and do not receive trademark protection. *Alzheimer's Disease*, 307 F. Supp. 3d at 287 (citation omitted). Descriptive marks describe "a product's features, qualities or ingredients in ordinary language, and may be protected only if a secondary meaning is established." *Id.* (citation omitted). Suggestive marks "merely suggest[] the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Lane Cap. Mgmt., Inc.*, 192 F.3d at 344. Arbitrary marks apply a "common word in an unfamiliar way," and fanciful marks are invented words for use as a mark. *Id.* Suggestive, arbitrary, and fanciful marks are considered inherently distinctive. *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 441 (S.D.N.Y. 2017).

Goat Fashion contends that its use of the GOAT mark is arbitrary or, at worst, suggestive. *See* Pl. Mem. at 10.  1661 does not dispute either characterization.  As Goat Fashion notes, its use of the mark may have at one point been suggestive, as its products were primarily cashmere, a material made from goat hair.  *See id.*  However, as Goat Fashion's offerings have grown, it has employed a variety of different products, and the mark is now likely arbitrary.  *Id.*  As such, Goat Fashion does not need to prove a secondary meaning for the mark to have conceptual strength.  And indeed, that the USPTO did not request from Goat Fashion proof of a secondary meaning when Goat Fashion registered the mark creates a rebuttable presumption that the mark is more than descriptive.  *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir. 1990). 1661 does not attempt to rebut this presumption.

The commercial strength inquiry focuses on "the degree of consumer recognition that the mark has achieved."  *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 100 (2d Cir. 2001). In determining the degree of consumer recognition, courts will look to the same kind of evidence used to determine if the mark has a secondary meaning, namely "advertising expenditures; (2) consumers studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use."  *Alzheimer's Disease*, 307 F. Supp. 3d at 289 (citing *Thompson Med. Co.*, 753 F.2d at 217); *see also Christian Louboutin S.A.*, 696 F.3d at 226.

Goat Fashion contends that it has spent approximately $300,000 "marketing, advertising, and promoting" its products in the United States.  Lewis Decl. ¶ 56.  1661 argues that this amount of advertising spending is insufficient to establish recognition in the marketplace.  Def. Opp. at 22.  To be sure, modest advertising relative to competitors is, by itself, unlikely to demonstrate commercial strength.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,

269 F.3d 114, 123 (2d Cir. 2001) (finding mark commercially weak due to low commercial

success, low advertising spending relative to competitors, and sale of the mark to a third party);

*Woodstock Ventures LC v. Woodstock Roots, LLC*, 387 F. Supp. 3d 306, 316 (S.D.N.Y. 2019)

(finding mark commercially weak where registrant spent $249,000 on marketing but did not

offer evidence of sales success, unsolicited media coverage, or any other factors); *CSL Silicones,*

*Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 357 (D. Conn. 2018) (evidence that registrant

"advertised, marketed and promoted" its marks in the United States was insufficient to find the

marks were commercially strong as a matter of law).  However, 1661 does not address other

indicators of the strength of Goat Fashion's mark, except to dispute the extent to which Goat

Fashion can properly estimate its U.S. sales.  *See* Def. Opp. at 6.  Goat Fashion purports to

average $300,000 per year in US wholesale sales and to have experienced a 400% increase in

retail e-commerce sales between 2016 and 2019, leading to retail sales of more than $500,000

in 2019.  Pl. Reply at 9–10.  Goat Fashion also points to various instances of unsolicited media

coverage in the U.S., including mentions of the brand in *Glamour*, *Harvard Business Review*,

*Vanity Fair*, *Vogue U.S.*, *Harper's Bazaar U.S.*, and *Forbes*, among others. Lews Decl. ¶¶ 61–75.

Finally, Goat Fashion has been using the GOAT mark in the United States since August 2003, *id.*

¶ 3, and has taken steps to protect its exclusive use, *see* Dkt. 28 ("Telesca Decl.") ¶¶ 6–46.

    Goat Fashion has thus demonstrated that it has a valid trademark that is both conceptually

and commercially strong.  The first factor favors Goat Fashion.

ii.     Similarity of the marks

    When evaluating the similarity of the marks, "courts look to the overall impression

created by the [marks] and the context in which they are found and consider the totality of

factors that could cause confusion among prospective purchasers." *Gruner + Jahr Printing &*

22

*Publ'g Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993).  This inquiry goes beyond a

mere side-by-side comparison; that two marks appear similar is not dispositive.  *See Hormel*

*Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503–04 (2d Cir. 1996).  The Second

Circuit has instructed courts to compare the marks "in their entirety, because 'juxtaposing

fragments of each mark [or dress] does not demonstrate whether the marks as a whole are

confusingly similar.'"  *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 315

(S.D.N.Y. 2000) (quoting *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 117

(2d Cir. 1984)).

Goat Fashion argues that the GOAT marks are identical, both in appearance and in sound

(*i.e.*, pronunciation).  Pl. Mem. at 12–13.  It disputes that there is a meaningful distinction

between the GOAT marks even if 1661 sometimes uses its mark with lowercase letters.  *Id.*

at 13.  The Court agrees.  Whether or not the letters are capital, the marks sound the same and

include the same word.  The potential difference in appearance from capital letters is immaterial.

*See Perfect Pearl Co., Inc.* v. *Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 536 (S.D.N.Y.

2012) (Engelmayer, J.) (parties' MAJESTIC marks were very similar where one mark was in

cursive and the other in block letters).  It is enough that the ordinary consumer could interpret the

similar marks as indicating that the products derive from the same source.  *See Stix Prods., Inc.*

*v. United Merchs. & Mfrs., Inc.*, 295 F. Supp. 479, 493–94 (S.D.N.Y. 1968) (law cannot expect

average consumers to make a "microscopic examination" to discern the differences between

marks).  The average consumer, seizing on the memorable word "GOAT," would likely perceive

these caprine marks as similar and have difficulty distinguishing the brands.  In any event, the

context of the marks is not so different as to allow consumers to easily differentiate the marks.

Although Goat Fashion sells luxury fashion items and 1661 sells sneakers and casual apparel,

both are in the high-end retail market.  Therefore, the Court agrees with Goat Fashion that the similarity of the marks weighs strongly in its favor.

iii.      Competitive proximity of the products

The "competitive proximity" factor concerns whether and to what extent products bearing the two parties' marks compete with each other.  *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996).  Courts assessing this factor consider "whether the products serve the same purpose and whether they share similar geographic distribution, market position and audience appeal."  *La Cibeles, Inc. v. Adipar, Ltd.*, No. 99 Civ. 4129 (AGS), 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000) (citation omitted); *see also Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 517 (S.D.N.Y. 1993) ("Factors to consider in determining the competitive proximity of the products include appearance, style, function, fashion appeal, advertising orientation and price.") (citing *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1134 (2d Cir. 1979), *superseded on other grounds by* Fed. R. Civ. P. 52(a)).  If the products "serve the same purpose, fall within the same general class or are used together, the use of similar designations is more likely to cause confusion."  *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991).

The parties' different clienteles suggest that Goat Fashion's and 1661's products are not, for the most part, presently directly competitive.  Both sell apparel and apparel accessories, but Goat Fashion targets the luxury womenswear market, while 1661 targets "sneakerheads" and the "street style" streetwear.  Def. Opp. at 3–6.  Goat Fashion argues that both sell high-end apparel products, *see* Pl. Mem. at 14–15; Pl. Reply at 8–9, that modern "streetwear" is no longer as distinct as it once may have been, and that "streetwear" is not necessarily low-end, Pl. Mem. at 14–15.  Goat Fashion is correct that the lines among these market niches are blurred and fluid,

24

not sharp.  However, 1661 focuses on athletic "street style," Def. Opp. at 3, and this focus is assuredly outside the heartland interest of Goat Fashion's clientele base.  Thus, although the parties compete in the apparel space, there likely presently exist distinctions between their customer bases.  Goat Fashion will likely be blurring those distinctions as it introduces new casual, streetwear lines, *see infra*.  It has not, however, done so yet.

This factor is either inconclusive or weakly favors 1661.

<blockquote>iv.      Likelihood that Goat Fashion will bridge the gap</blockquote>

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).  This factor "protects the plaintiff's interest in being able to enter a related field at some future time." *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 619 (2d Cir. 2008).

Goat Fashion argues that no gap presently exists, but notes that, assuming *arguendo* that it does, it has begun bridging the gap with a line of casual, stretchy jersey separates.  Pl. Mem. at 16.  1661 disputes that the jersey separates are bridging the gap because the pencil skirts and tops are not similar to 1661's streetwear style and because the jersey line would not appeal to 1661's "sneakerhead" clientele.  *See* Def. Opp. at 19–20.  But the proper question is whether the line would bridge the gap between Goat Fashion's and 1661's *apparel* clientele.  The Court agrees with Goat Fashion that it likely would.  The jersey collection suggests that Goat Fashion intends to move into a more casual, lower-priced streetwear market.  Although 1661 contends that Goat Fashion's jersey collection will not be "even remotely close to the athletic-inspired streetwear offered" on its e-commerce platform, *id.* at 20, the Court is unconvinced that the

market for elevated jersey streetwear is entirely distinct from that of athletic-inspired streetwear. This factor thus weighs in Goat Fashion's favor.

v.    Actual confusion

Although "actual confusion need not be shown to prevail under the Lanham Act," *Lois Sportswear*, 799 F.2d at 875, "[t]here can be no more positive or substantial proof of the likelihood of confusion." *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 385 (S.D.N.Y. 2008) (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004)). Accordingly, "courts have concluded that the absence of such evidence may favor the junior user." *Paco Sport*, 86 F. Supp. 2d at 319 (collecting cases); *accord McGregor-Doniger*, 599 F.2d at 1136 ("[I]t is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." (citation omitted)).  "Evidence of actual confusion may consist of anecdotal or survey evidence." *Paco Sport*, 86 F. Supp. 2d at 319.  To be relevant under the Lanham Act, the confusion must be of a type that "could inflict commercial injury [on the plaintiff] in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang*, 949 F.2d at 583; *see also Tr. of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y. 1997) ("[T]here is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions.").

Here, Goat Fashion has convincingly pointed to various examples of actual consumer confusion resulting from 1661's sales of both athletic shoes and apparel.  *See* Lewis Decl. ¶¶ 114–118.  Its platform, in fact, has received repeated search requests for merchandise sold by 1661.  For example, as noted, as of March 2020, Goat Fashion's e-commerce platform has received more than 2,758 searches for "yeezy," a sneaker produced by Adidas and designed by

26

Kayne West, and "yeezy" was the most popular search terms on Goat Fashion's platform. *Id.* ¶ 115. Goat Fashion has also noted searches for "Nike Jordan 1," "Nike," and "Jordan 1." *Id.* ¶ 116. Such sneakers are sold by 1661 but not Goat Fashion. Goat Fashion has also identified searches for apparel items sold on 1661's e-commerce platform but not on Goat Fashion's, including "supreme shirt" and "Gucci belt." *See* Dkt. 47 ("Wakeling Decl.") ¶¶ 12–15. Between 2019 and 2020, Goat Fashion identified "at least 40 instances of actual confusion on Goat Fashion's U.S. website and at least 38 instances of actual confusion on Goat Fashion's main website." Pl. Reply. at 7. Goat Fashion also explained that "before the COVID-19 shutdown, [its] customer care team received on average 2 to 3 communications each week from 1661's customers." *Id.* Goat Fashion contends that many of these calls came from U.S. customers who dialed its international help numbers. *Id.*

The Court finds, with Goat Fashion, that there is strong evidence of actual confusion between the platforms. There has already been evidence of apparel-related confusion, and this confusion is not isolated or momentary. Tellingly, 1661 consumers are contacting Goat Fashion and searching for 1661's items on Goat Fashion's website. Such clear and substantial confusion may impact Goat Fashion's ability to control its reputation. As such, the Court finds the factor of actual confusion to weigh strongly in Goat Fashion's favor.

vi.    Bad faith

The bad-faith inquiry "considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." *De Beers LV Trademark Ltd. V. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (quoting *Savin Corp.*, 391 F.3d at 460). "Evidence of intentional copying by a junior user may be indicative of an intent to create a

confusing similarity between the products." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992).

Goat Fashion argues that 1661 acted in bad faith by selling apparel and apparel accessories under the GOAT mark with knowledge of Goat Fashion's mark, *see* Pl. Mem. at 17–18, and by intentionally breaching the Consent Agreement, *see* Pl. Reply at 10. However, courts in this Circuit have found that junior users with prior knowledge of a mark have not been shown to have acted in bad faith in the absence of evidence of intent to promote confusion among customers or exploit the goodwill of the senior user. *See Star Indus.*, 412 F.3d at 388. As Goat Fashion concedes, "1661 did not deliberately copy Goat Fashion's mark," Pl. Mem. at 17, and Goat Fashion has not offered any evidence that 1661 used the mark to sell apparel with the intent of confusing customers or capitalizing on Goat Fashion's reputation. Nor does 1661's purported intentional breach of the Consent Agreement resolve the bad-faith inquiry. As the Supreme Court has recognized, unlike copyright and patent protection, trademark protection laws are "*not* designed to protect originality or creativity" but to protect consumers from deception. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) (emphasis in original). Thus, regardless of whether 1661 intended to breach the Consent Agreement, the relevant inquiry is whether 1661 acted in bad faith in adopting the GOAT mark in order to create confusion or to take advantage of the senior user's reputation. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117–18 (2d Cir. 2009); *Star Indus.*, 412 F.3d at 388. Goat Fashion has not yet presented evidence that 1661 acted in bad faith in adopting its mark. This factor weighs in favor of 1661.

### vii. Quality of 1661's products

The seventh *Polaroid* factor, the quality of the defendant's product, "directs courts to weigh cross-cutting considerations." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 340 (S.D.N.Y. 2013).

> On the one hand, the court must determine "whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." On the other hand, if the products are roughly equal in quality, the court must also consider whether "that very similarity of quality" may tend to create confusion as to source by bringing the products into even closer proximity.

*Id.* (quoting *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999)).

The parties dispute the extent to which Goat Fashion's website is superior to 1661's. *See* Pl. Mem. at 18; Def. Opp. at 20–21. It is not certain that 1661's website is clearly inferior to Goat Fashion's. However, Goat Fashion points to evidence of customer complaints against 1661, including allegations of "selling counterfeit goods, delayed deliveries, and 'beyond horrible' customer service," among others. Pl. Reply at 2. Regardless of the objective quality of the parties' respective websites, customer complaints against 1661's e-commerce platform and its service have the potential to tarnish Goat Fashion's reputation. This factor weighs in Goat Fashion's favor.

### viii. Sophistication of Goat Fashion's consumers

The final *Polaroid* factor, consumer sophistication, "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (citation omitted). In a reverse-confusion case, "the consumers relevant to [this] inquiry are those who purchase [the plaintiff's] products." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 742

(2d Cir. 1994).  In general, "[t]he greater the value of an article, the more careful the typical consumer can be expected to be."  *McGregor-Doniger*, 599 F.2d at 1137 ("[T]he average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine."); *accord Dooney & Bourke*, 561 F. Supp. 2d at 389 ("If the goods are expensive, the reasonably prudent buyer does not buy casually, but only after careful consideration.  Thus, confusion is less likely than where the goods are cheap and bought casually." (internal quotation marks omitted) (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:8.50 (4th ed.))).  "The more sophisticated the consumers, the less likely they are to be misled by similarity in marks."  *TCPIP*, 244 F.3d at 102 (citing *Cadbury Beverages, Inc.*, 73 F.3d at 480); *see also Centaur Commc'ns, Ltd. V. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1228 (2d Cir. 1987) (existence of sophisticated consumers "usually militates against a finding of a likelihood of confusion").

Because this case involves reverse confusion (*i.e.*, the junior user's customers confusing the senior user for the junior), it is Goat Fashion's customers that are relevant to this factor.  Goat Fashion's consumers are certainly sophisticated insofar as they are purchasing expensive, high-end products.  These purchases likely involve a fair amount of deliberation, mitigating against confusion.  Goat Fashion argues that even sophisticated buyers can become confused by identical marks in similar markets, and the marks are very similar here.  *See* Pl. Mem. at 19.  However, this analysis of Goat Fashion's is more apt for the balancing of the factors and does not directly respond to the question of sophistication.  As such, this factor weighs in 1661's favor.

ix.     Balancing the factors

The Court's analysis of the *Polaroid* factors is not a mechanical application.  Rather, it demands that the Court assess, examining the products "in their totality," whether customers are likely to be confused.  *Star Indus.*, 412 F.3d at 384.  Considering the strength of Goat Fashion's mark, the similarity between the marks, the likelihood that Goat Fashion will bridge the gap so as to sell apparel in a space occupied by 1661's sales, the proof of actual confusion, and the quality of 1661's product, the Court finds that Goat Fashion will likely succeed in demonstrating that there is a likelihood of confusion if 1661 continues to use the GOAT mark to sell apparel and apparel products.  Despite the factors that weigh in 1661's favor—namely, the competitive proximity of the products, 1661's apparent lack of bad faith in adopting the mark, and the sophistication of Goat Fashion's customers—the similarity of the marks and actual confusion in particular suggest that consumers may confuse the products.

Goat Fashion has thus established a likelihood of success on the merits for its Lanham Act claims.

c.     *Common law trademark and unfair competition claims*

Under New York law, "the elements necessary to prevail on causes of action for trademark infringement and unfair competition . . . mirror the Lanham Act claims."  *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) (citation omitted).  However, in addition to showing likelihood of confusion, to prevail on a claim of unfair competition under New York law, a plaintiff must demonstrate that the defendant acted in bad faith.  *See Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 408 (2d Cir. 1997) ("[T]he essence of unfair competition is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the

goods.") (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995)).

Thus a plaintiff "must couple its evidence supporting liability under the Lanham Act with

additional evidence demonstrating [the defendant's] bad faith." *Info. Superhighway, Inc. v. Talk*

*Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (quoting *Philip Morris USA Inc. v. Felizardo*,

No. 03 Civ. 5891 (HB), 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004)).

The Court has already determined that Goat Fashion will likely succeed in proving that

1661's continued use of the GOAT mark to sell apparel will cause customer confusion.

Consequently, Goat Fashion is likely to prevail on the merits of its common law trademark-

infringement claim.  All that is necessary for its unfair competition claim is a showing of bad

faith.  However, Goat Fashion has, thusfar, failed to demonstrate that 1661 acted with bad faith.

Although 1661 may have intentionally breached the Consent Agreement and used the GOAT

mark to sell apparel with knowledge of Goat Fashion's registrations, Goat Fashion has not

offered any evidence suggesting that 1661 adopted the GOAT mark to confuse customers by

misappropriating Goat Fashion's labors and expenditures.  At this stage, Goat Fashion has not

shown that it is likely to succeed on the merits of its common law unfair-competition claim.

### 3.    Balance of Hardships

A preliminary injunction may not issue unless the movant clearly shows that the balance

of equities favors the movant.  *Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 451–52

(S.D.N.Y. 2011).  Goat Fashion has met this burden.  1661's clear contract breach has put Goat

Fashion's reputation at risk.  And although the injunction would prevent 1661 from selling

apparel using the GOAT mark, it is already contractually barred from doing so.  Further, 1661

would retain the ability to sell athletic footwear using the GOAT mark, which represents the

majority of its business.  Def. Opp. at 3.  An injunction would return the parties to the status quo enshrined in their Consent Agreement.

1661 argues that an order enjoining 1661 from selling apparel on its e-commerce platform would prevent it from "offering the same services it has offered for almost five years (authentication services that Plaintiff expressly consented to in the 2017 Consent Agreement)." *Id.* at 24.  But 1661 did not begin selling *apparel* on its mobile platform until October 2019 or on its e-commerce platform until February 2020.  *Id.* at 3.  And 1661 does not currently appear to authenticate clothing.  *See* Sugano Decl. ¶ 10 (retail products are "pre-verified" and are shipped directly from retailers to consumers).

Further, an injunction against selling apparel is not nearly as sweeping or consequential as depicted by 1661.  Granting the preliminary injunction mitigates the harms that 1661's apparel sales present to Goat Fashion's reputation—harms which may be difficult or impossible to quantify.  And, as noted, it prohibits 1661 from engaging in conduct that breaches the Consent Agreement.  Although 1661 would likely be harmed by its inability to perform on any contracts that relate to its apparel offerings using the GOAT mark, that is a problem of its own making, as it had bound itself in the Consent Agreement not to do so.  And the potential harm to 1661 by eliminating this corner of its business is outweighed by the potential harm to Goat Fashion. Further, 1661 began selling apparel on its mobile platform after settlement negotiations had begun, and it began selling apparel on its e-commerce website after the Complaint had been filed.  *See* Lewis Decl. ¶¶ 6–7; Sugano Decl. ¶ 14.  It thus acted with full knowledge of the potential implications of this action—it assumed the risk of entry of the preliminary injunction that Goat Fashion seeks.  The balance of hardships therefore lopsidedly favors Goat Fashion.

### 4.     Public Interest

Finally, Goat Fashion has also met its burden of demonstrating that "the public interest would not be disserved by a permanent injunction." *Salinger*, 607 F.3d at 77 (citation omitted). The public "has a protectable interest in being free from confusion, deception and mistake[.]" *NYP Holdings v. N.Y. Post Pub. Inc.*, 63 F. Supp. 3d 328, 342 (S.D.N.Y. 2014) (quoting *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011)). Customer confusion has resulted from 1661's use of its GOAT mark in connection with apparel, and preventing this confusion would benefit the public.[6]

### CONCLUSION

For the foregoing reasons, the Court grants Goat Fashion's motion for a preliminary injunction. The Clerk of Court is respectfully directed to terminate the motion pending at docket 26.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 28, 2020
       New York, New York

---

[6] 1661 argues that if Goat Fashion prevails in its motion, it should have to post bond. *See* Def. Opp. at 31 (citing Fed. R. Civ. P. 65(c)). Goat Fashion argues that it is up to the discretion of the Court whether or not the prevailing party is required to post bond, depending on proof of likelihood of harm. *See* Pl. Mem. at 23. Because the Court is not convinced that a preliminary injunction will pose consequential cognizable harm to 1661, no such bond is required. *See Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

34